**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELLEN RUBKE, AS TRUSTEE
OF THE 1986 RUBKE LIVING
TRUST, and JACK FERGUSON,
individually and on behalf of all
other similarly situated
shareholders of Napa Community Bank,

                    No. C 05-4800 PJH

**ORDER GRANTING
DEFENDANT'S MOTION TO
DISMISS PLAINTIFFS' FIRST
AMENDED COMPLAINT**

                    Plaintiffs,

         v.

CAPITOL BANCORP LTD., a Michigan
corporation, and JOSEPH D. REID,

                    Defendants.
_____/

        Defendants Joseph Reid and Capitol Bancorp Ltd.'s ("Capitol")[1] motion to dismiss

plaintiffs' first amended complaint ("1AC") pursuant to Federal Rule of Civil Procedure

("FRCP") 12(b)(6) came on for hearing before this court on October 11, 2006.  Having read

the parties' papers and carefully considered their arguments and the relevant legal

authorities,  the court GRANTS Capitol's motion to dismiss.

                              **BACKGROUND**

        **A.      Procedural Background**

        This is a proposed class action alleging violations of the federal securities laws.  The

proposed plaintiff class consists of minority shareholders of Napa Community Bank ("NCB")

who sold their shares to Capitol pursuant to a tender offer.

_____

        [1]The court refers to defendants collectively as "Capitol."

On June 16, 2006, the court granted Capitol's prior motion to dismiss claims 1-5 of the original complaint with leave to amend.  It dismissed state law claims 6-8 with prejudice.  On July 31, 2006, plaintiffs filed their 1AC, which asserts six claims, including violations of the Securities Act of 1933, 15 U.S.C. § 77a et seq., violations of the Securities Exchange Act of 1934 and rules promulgated under that act, 15 U.S.C. § 78a et seq. Capitol moves to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

The 1AC includes the same five claims dismissed with leave to amend in the original complaint, and adds one new claim.  The six claims contained in the 1AC are as follows:

(1)    Violation of 1933 Securities Act § 11 based on false and misleading statements in the registration statement (also claim one in the original complaint);

(2)    violation of 1933 Securities Act § 12(a)(2) (claim is new to 1AC);

(3)    violation of § 15 of the Securities Act – Reid only (formerly claim 2);

(4)    violation of § 10(b) and Rule 10b-5 of the Exchange Act (formerly claim 3);

(5)    violation of § 20(a) of the Exchange Act – Reid only (formerly claim 4); and

(6)    violation of Exchange Act § 14(e) based on false and misleading statements in tender offer (formerly claim 5).

**B.    Factual Background**

Plaintiffs Rubke and Ferguson, on behalf of themselves and members of the plaintiff class, filed this action on November 23, 2005, against Capitol.  Rubke is a resident of California, and Ferguson is a resident of Hawaii.  They were both NCB common shareholders prior to and at the time of the exchange offer in this case.

Capitol is a Michigan corporation; and Reid is a Michigan resident.  He was the chairman of the board, president, and CEO of Capitol, and signed the SEC registration statement that contained the terms of the share exchange offer at issue in this case.

Capitol has founded over 30 small community banks, one of which is NCB.  It utilizes a similar model with respect to all the banks.  It solicits local investors to form the new bank, and tells the investors that it will always own a majority interest in the new bank, thereby controlling the bank.  It also tells investors that on the bank's third anniversary, it

1  will probably offer to buy out the minority shareholders at 150% of the stock's book value.

2  It also tells the investors that there will likely be no public market for their stock in the bank.

3      In 2001, Capitol solicited investors in the Napa area to invest in NCB.  Its offer was

4  consistent with its typical business model.  *See* Offering Circular or Private Placement,

5  RJN, at Exh. 1. During the same period, Capitol also solicited investors for First California

6  Northern (referred to by parties both as "NCB Holdings" and "First California Northern"),[2] a

7  holding company whose purpose was to control Capitol's stake in NCB.  Capitol owned

8  51% of NCB Holdings through an intermediate subsidiary.  In turn, NCB Holdings owned

9  51% of NCB.

10      NCB began operations in March 2004, and became and remains one of the most

11  successful Capitol-affiliated community banks.  Throughout its existence, Capitol has

12  remained the controlling shareholder of NCB and NCB Holdings.

13      Thereafter, in May 2004, Capitol offered to NCB Holdings' minority shareholders (not

14  the exchange that is the subject of the instant lawsuit) to exchange shares of Capitol for

15  those of NCB Holdings at a ratio that translated to 167% of the book value of the common

16  stock of NCB Holdings.  *See* Suppl RJN, Exhs. 15 (also referred to by the parties as "First

17  California Northern" share exchange).  That exchange offer was accompanied by a fairness

18  opinion from JMP Financial ("JMP"), a Michigan-based firm.  *See id.* at Exh. 16.

19      In early 2005, certain NCB minority shareholders formed a "minority shareholders

20  committee" ("MSC") based on their concerns regarding Capitol's influence over NCB and its

21  intent to acquire ownership of NCB.  In April 2005, Capitol filed its registration statement

22  with the SEC in connection with its offer to exchange shares ("exchange offer" or "tender

23  offer") of Capitol, which is publicly traded, for NCB minority shareholders' shares in NCB,

24  RJN, Exh. 2, which it amended in May 2005.  RJN, Exh. 3.  Capitol sent NCB shareholders

25  the Exchange Offer itself on June 2, 2005.  RJN, Exhs. 4 & 5.  The exchange offer, which

26  expired on June 30, 2005, was accompanied by two financial fairness opinions.  One was

27  from JMP (the same entity that provided an opinion in connection with the 2004 NCB

28  ———————————

[2]At the October 11, 2006 hearing, the parties confirmed that "NCB Holdings" and "First California Northern" were in fact the same entity.

1   Holdings share exchange); and another was provided by Howe Barnes Investments, Inc.

2   ("Howe").  RJN, Exh. 4 at 290-296.

3         Capitol offered to exchange shares of NCB common stock for shares of Capitol

4   stock, at a ratio equal to approximately 150% of the book value of NCB's common stock.

5   *Id.* (Capitol notes that by swapping NCB shares for Capitol stock, NCB shareholders were

6   also gaining liquidity since Capitol is traded on the NYSE and NCB was not.).  Capitol

7   represented that the book value of NCB stock was approximately, $10.60 per share.

8   Therefore, Capitol was to issue approximately $15.90 worth of Capitol shares for each NCB

9   share tendered, or, in other words, approximately 0.49 Capitol shares for each NCB share.

10        The minority shareholders committee ("MSC") obtained its own fairness opinions

11  regarding the exchange offer from The Findley Group ("Findley") and Hoefer & Arnett, Inc.

12  ("Hoefer").  Those opinions stated that the *fair market value* of the NCB shares was

13  approximately $21/share.  The MSC allegedly gave the opinions to Capitol.  Subsequently,

14  the MSC called for a shareholder meeting to discuss Capitol's offer, but no meeting was

15  held.  On June 27, 2005, certain MSC members filed a lawsuit with this court (05-2601

16  PJH) to block the exchange.  That lawsuit was subsequently dismissed.

17        The exchange offer closed on June 30, 2005, with Capitol owning approximately

18  87% of NCB.  There does not appear to be any dispute that the NCB shareholders who

19  tendered their NCB shares received a 35% increase over the value of the NCB shares

20  formerly held on the Capitol shares received in exchange.

21        The plaintiffs allege that when Capitol made its tender offer, it under-valued the NCB

22  stock.  Plaintiffs contend that Capitol was able to purchase the NCB stock at a price

23  substantially below the fair market value as a direct result of misrepresentations and

24  omissions of material fact made by defendants in the registration statement and share

25  exchange offer.  They contend that these misrepresentations and omissions materially

26  affected plaintiffs' decisions to exchange their NCB stock for Capitol stock.

27

28

**DISCUSSION**

4

## A.     Legal Standards

### 1.     Federal Rule of Civil Procedure 12(b)(6)

A court should dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim only where it appears beyond doubt that plaintiff can prove no set of facts in support of the claim which would entitle the plaintiff to relief.  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Williamson v. Gen'l Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir. 2000).  All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996).

Review is generally limited to the contents of the complaint.  *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 385 (9th Cir. 1995).  However, material that is properly presented to the court as part of the complaint may be considered as part of a motion to dismiss.  *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2001).  If a plaintiff fails to attach to the complaint the documents on which it is based, defendant may attach to a Rule 12(b)(6) motion the documents referred to in the complaint to show that they do not support plaintiff's claim. Id. In addition, whether requested or not, the court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned.  *See* Fed.R.Evid. 201; *see also In re Silicon Graphics, Inc., Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (SEC filings); *Bryant v. Avedo Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (same); *Ravens v. Iftikar*, 174 F.R.D. 651, 660 (N.D. Cal. 1997) (closing stock prices).

### 2.     Federal Rule of Civil Procedure 9(b)

Generally, plaintiffs in federal court are required to give a short, plain statement of the claim sufficient to put the defendants on notice.  Fed. R. Civ. P. 8.  In actions alleging fraud, however, "the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  Under Rule 9(b), the complaint must allege specific facts regarding the fraudulent activity, such as the time, date, place, and content of the alleged fraudulent representation, how or why the representation was false or misleading, and in some cases, the identity of the person engaged in the fraud. *In re GlenFed Sec.*

1  *Litig.*, 42 F.3d 1541, 1547-49 (9th Cir. 1994).  Because the plaintiff must set forth what is

2  false or misleading about a particular statement, he must do more than simply allege the

3  neutral facts necessary to identify the transaction; he must also explain why the disputed

4  statement was untrue or misleading at the time it was made. *Yourish v. California Amplifier*,

5  191 F.3d 983, 992-93 (9th Cir. 1999).

6  ### 3.    Claims under the 1934 Act

7  Section 10(b) of the Securities Exchange Act of 1934 provides, in part, that it is

8  unlawful "to use or employ in connection with the purchase or sale of any security

9  registered on a national securities exchange or any security not so registered, any

10  manipulative or deceptive device or contrivance in contravention of such rules and

11  regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

12  Rule 10b-5 makes it unlawful for any person to use interstate commerce

13     (a) To employ any device, scheme, or artifice to defraud,
   (b) To make any untrue statement of a material fact or to omit to state a

14  material fact necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading, or

15     (c) To engage in any act, practice, or course of business which operates or
would operate as a fraud or deceit upon any person, in connection with the

16  purchase or sale of any security.

17  17 C.F.R. § 240.10b-5.

18  To plead securities fraud under Section 10(b) of the 1934 Act or Rule 10b-5,

19  plaintiffs must allege (1) a misstatement or omission (2) of material fact (3) made with

20  scienter (4) on which plaintiffs relied (5) which proximately caused the plaintiffs' injury.

21  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 388 (9th Cir. 2002).  A

22  presumption of reliance is available to plaintiffs alleging violations of § 10(b) based primarily

23  on omissions of material fact, but not in cases alleging significant misrepresentations in

24  addition to omissions, or alleging only misrepresentations.  *Id.* at 1063-64.  A presumption

25  of reliance is also available in a "fraud on the market" case,

26  where the plaintiff alleges that a defendant made material representations or omissions

27  concerning a security that is actively traded in an "efficient market."  *Id.* at 1064 (citing

28  *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988)).

1    Section 14(e) regulates tender offers.  It is entitled "Untrue statement of material fact

2    or omission of fact with respect to tender offer" and provides:

3        It shall be unlawful for any person to make any untrue statement of a material
         fact or omit to state any material fact necessary in order to make the
4        statements made, in the light of the circumstances under which they are
         made, not misleading, or to engage in any fraudulent, deceptive, or
5        manipulative acts or practices, in connection with any tender offer or request
         or invitation for tenders, or any solicitation of security holders in opposition to
6        or in favor of any such offer, request, or invitation.

7    15 U.S.C. § 78n(e).  In order to state a claim for a violation of section 14(e), the plaintiff

8    must allege that: (1) the defendant made misstatements or omissions of material facts; (2)

9    in connection with a tender offer. *Church v. Consolidated Freightways, Inc.*, 1991 WL

10   284083 (N.D. Cal. 1991).

11   While other circuits require that plaintiffs must also prove reliance and causation in

12   connection with a section 14(e) claim, the Ninth Circuit does not appear to require either.

13   *See Plaine v. McCabe*, 797 F.2d 713, 721 (9th Cir. 1986) *Kahn v. Lynden*, 705 F.Supp.

14   1458, 1463-64 (W.D. Wash. 1989).  In *Plaine,* the Ninth Circuit held that the plaintiff need

15   *not* prove causation separately with respect to a section 14(e) claim.  Instead, "the plaintiff

16   succeeds in proving causation once the misstatement or omission has been shown to be

17   material."  797 F.2d at 721.  Additionally, contrary to other district courts, at least two

18   district courts in the Ninth Circuit have held that based on the Ninth Circuit's decision in

19   *Plaine*, plaintiffs need not prove reliance in connection with 14(e).  *Church*, 1991 WL

20   284083 at *9 ("reliance is not an 'essential element' of a claim under section 14(e). . .;

21   rather the true element is the making of the misrepresentation and omission, and from that

22   causation is presumed once the plaintiff demonstrates that such misrepresentation or

23   omission is material"); *Kahn*, 705 F.Supp. at 1463-64 (same).

24   Under § 20(a) of the 1934 Act, joint and several liability can be imposed on persons

25   who directly or indirectly control a violator of the securities laws. 15 U.S.C. § 78t(a).

26   Violation of § 20(a) is predicated on a primary violation under the 1934 Act.  *Heliotrope*

27   *Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 2000).  Plaintiffs alleging a claim

28   that individual defendants are "controlling persons" of a company must allege 1) that the

individual defendants had the power to control or influence the company, 2) that the

7

1  individual defendants were culpable participants in the company's alleged illegal activity,

2  and 3) that the company violated the federal securities laws. *Durham v. Kelly*, 810 F.2d at

3  1503-04; *see also Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

4                **4.    The Private Securities Litigation Reform Act**

5          The Private Securities Litigation Reform Act ("PSLRA") was enacted by Congress in

6  1995 to establish uniform and stringent pleading requirements for securities fraud actions,

7  and "to put an end to the practice of pleading 'fraud by hindsight.' '  *In re Silicon Graphics*,

8  183 F.3d 970, 958 (9th Cir.1999). The PSLRA heightened the pleading requirements in

9  private securities fraud litigation by requiring that the complaint plead both falsity and

10 scienter with particularity.  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084 (9th Cir.

11 2002).  If the complaint does not satisfy these pleading requirements, the court, upon

12 motion of the defendant, must dismiss the complaint.  15 U.S.C. § 78u-4(b)(3)(A).

13         Under the PSLRA – whether alleging that a defendant "made an untrue statement of

14 a material fact" or alleging that a defendant "omitted to state a material fact necessary in

15 order to make the statements made, in the light of the circumstances in which they were

16 made, not misleading" – the complaint must now specify each statement alleged to have

17 been false or misleading, specify the reason or reasons why each such statement is

18 misleading, and, if an allegation regarding the statement or omission is made on

19 information and belief, state with particularity all facts on which that belief is formed. 15

20 U.S.C. § 78u-4(b)(1).[3]  If the challenged statement is not false or misleading, it does not

21 become actionable merely because it is incomplete.  *In re Vantive*, 283 F.3d at 1085; *Brody*

22 *v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

23         In addition – whether alleging that a defendant "made an untrue statement of

24 material fact" or alleging that a defendant "omitted to state a material fact" – the complaint

25 must now, with respect to each alleged act or omission, "state with particularity facts giving

26 rise to a strong inference that the defendant acted with the required state of mind."  15

27

28
_____

          [3]  Matters that are not alleged on personal knowledge are considered to be
alleged on information and belief.  *See In re Vantive*, 283 F.3d at 1085 n. 3.

U.S.C. § 78u-4(b)(2); *see also In re Vantive*, 283 F.3d at 1084.  By requiring particularized, detailed allegations showing a strong inference of scienter, the PSLRA was intended to "eliminate abusive and opportunistic securities litigation."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002).

In the Ninth Circuit, the required state of mind is "deliberate or conscious recklessness."  *In re Silicon Graphics*, 183 F.3d at 979.  If the challenged act is a forward-looking statement, the required state of mind is "actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1); *see No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Co.*, 320 F.3d 920, 931 (9th Cir. 2003).  Because falsity and scienter in securities fraud cases are generally strongly inferred from the same set of facts, the Ninth Circuit has incorporated the falsity and scienter requirements into a single inquiry.  *Id.* at 932.  While the court must take the totality of the allegations into account when considering whether the heightened pleading standard has been met, *see America West*, 320 F.3d at 945, the complaint must continue to comply with the *Silicon Graphics* standards in order to state a claim.  *In re Read-Rite*, 335 F.3d at 846.

On a Rule 12(b)(6) motion to dismiss a complaint brought under the PSLRA, when considering whether plaintiffs have shown a strong inference of scienter, "the district court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."  *Gompper*, 298 F.3d at 897 (noting the "inevitable tension . . . between the customary latitude granted the plaintiff on a [12(b)(6) ] motion to dismiss . . . and the heightened pleading standard set forth under the PSLRA). In other words, the court must consider all the allegations in their entirety in concluding whether, on balance, the complaint gives rise to the requisite inference of scienter.  *Id.*

## 5.    Claims under the 1933 Act

Pursuant to the PSLRA, plaintiffs must plead both falsity and scienter with a heightened degree of particularity to state a claim for a violation of section 10(b) of the 1934 Act.  *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003) (citations omitted).  In

1   contrast, the 1933 Act bars the inclusion of false statements in any initial registration

2   statements filed with the SEC, before the securities are sold to the public.  15 U.S.C. §

3   77(k).  Under this Act, plaintiffs need only show that false statements were made, and are

4   not required to demonstrate that the statements were made with scienter.  In other words,

5   the heightened pleading requirements of the PSLRA do not apply to these particular 1933

6   Act claims.  *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir. 2002).  However, if

7   the 1933 Act claims sound in fraud, the pleading must comply with Fed. R. Civ. P. 9.  *Id.,*

8   *citing In re Stac.*, 89 F.3d at 1404 (9th Cir. 1996).  This requires heightened pleading as

9   well, but requires only that "the circumstances constituting fraud or mistake . . . be stated

10  with particularity.  Malice, intent, knowledge, and other condition of mind of a person may

11  be averred generally."  *Id., quoting* Fed. R. Civ. P. 9(b).

12      Under § 11(a) of the 1933 Securities Act, any purchaser of a security covered by a

13  registration statement may sue based on material omissions or misrepresentations in that

14  statement.  15 U.S.C. § 77k(a).  Persons liable under § 11(a) are those who signed the

15  registration statement, directors of or partners in the issuer, professionals who participated

16  in the preparation of the registration statement, and underwriters of the security.  *Id.*  To

17  plead a § 11(a) claim, a plaintiff must allege that the registration statement contained an

18  omission or misrepresentation, and that the omission or misrepresentation was material –

19  that is, that it would have misled a reasonable investor about the nature of his or her

20  investment.  *In re Stac Electronics Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996).

21      Section 12(a)(2) of the 1933 Act makes it unlawful for any person to use any

22  instrumentality of interstate commerce to offer or sell securities by means of a prospectus

23  or oral communication that includes an "untrue statement of a material fact or omits to state

24  a material fact necessary in order to make statements, in the light of the

25  circumstances under which they were made, not misleading."  15 U.S.C. § 77l(a)(2).   To

26  make out a prima facie case, plaintiffs must prove: (1) an offer or sale of a security; (2) by

27  the use of any means of interstate commerce; (3) through a prospectus or oral

28  communication; (4) which includes an untrue statement of material fact."  *In re Itel*

*Securities Litig.*, 89 F.R.D. 104, 115 (N.D. Cal. 1981).  "The fourth element of plaintiff's

prima facie case is identical to plaintiff's prima facie case requirement under section 11 that the registration statement and prospectus contain an untrue statement of a material fact or omit to state a material fact." *Id.* "Plaintiffs also have the burden of proving that they did not know of the untrue statements or omissions when they purchased the securities." *Id.*

To establish liability under § 12(a)(2), "a plaintiff must allege that the defendants did more than simply urge another to purchase a security; rather, the plaintiff must show that the defendants solicited purchase of the securities for their own financial gain." *In re Dauo*, 411 F.3d at 1029 (citing *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1120 (D.Nev. 1998); *Pinter v. Dahl*, 486 U.S. 622, 646-48 (1988)). It also necessary that the plaintiff purchaser demonstrate damages to recover under section 12. *Id.* "[T]here can be no recovery unless the purchaser has suffered a loss." *Id.* "That is to say, what the purchaser is entitled to is a return of the consideration paid, reduced by the amount realized when he sold the security and by any 'income received' on the security." *Id.* (citation omitted). However, causation is not a necessary element of a prima facie case under section 12. *Id.*

No scienter is required for §§ 11 and 12 claims, and defendants may be liable for innocent or negligent material misstatements or omissions. *See In re Dauo*, 411 F.3d at 1027. However, "[a]lthough section[s] 11 [and 12] do[] not require a plaintiff to allege or prove fraud," a plaintiff will nevertheless be subject to Rule 9(b)'s heightened pleading standard if the complaint "sounds in fraud." *In re Dauo*, 411 F.3d at 1027 (citing *Vess*, 317 F.3d at 1103-04); *see also In re Stac*, 89 F.3d at 1404-05 (the same is the case for § 12 claims under 33 Act). The Ninth Circuit has held that a complaint "sounds in fraud" if the plaintiff alleges "a unified course of conduct and rel[ies] entirely on that course of conduct as the basis of a claim." *In re Dauo*, 411 F.3d at 1027.

"[W]here fraud is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)." *Id.* "Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." *Id.* "[I]f particular averments of fraud are insufficiently pled under Rule 9(b), a district court should disregard those averments or strip them from the claim." *Id.* at 1028. "The

1    court should then examine the allegations that remain to determine whether they state a

2    claim." *Id.*

3         However, the court "need not rewrite a deficient complaint." *Id.* Where the

4    complaint "makes a *wholesale adoption* of the securities fraud allegations for purposes of

5    the [1933 claim[], the Ninth Circuit has held that the

6         district court is not required to sift through allegations of fraud in search of
          some 'lesser included' claim of strict liability.  It may dismiss.  If it does so, it
7         should ordinarily accept a proffered amendment that either pleads with the
          requisite particularity or drops the defective allegations and still states a claim.
8    *Id.*

9         Section 15(a) imposes joint and several liability upon every person who controls

10   any person liable under § 11 or § 12.  15 U.S.C. § 77o.  Thus, violation of § 15(a) is

11   predicated upon violation of § 11 or § 12.  To state a claim for control person liability under

12   § 15(a), a plaintiff must allege that the individual defendants had the power to control or

13   influence the company, and that the individual defendants were culpable participants in the

14   company's alleged illegal activity.  *Durham v. Kelly*, 810 F.2d 1500, 1503 (9th Cir. 1987).

15        **B.   Defendants' Motion**

16             **1.   Plaintiffs' First Amended Complaint**

17        Previously, plaintiffs based their section 11 claim on essentially five categories of

18   allegations, including: (1) the "true value" of NCB stock; (2) MSC's fairness opinions; (3)

19   Capitol's fairness opinions; (4) the services provided by Capitol to NCB; and (5) other

20   alleged misrepresentations.  They based their section 10(b) and 14(e) claims on four

21   groups of allegations, including:  (1) the fairness of the exchange offer; (2) alleged collusion

22   between Capitol and NCB board; (3) ability to accept the exchange offer via fax; and (4)

23   Reid's exercise of options.

24        The claims in plaintiffs' 1AC are based on many of the same allegations contained in

25   the original complaint.  The 1AC includes essentially six categories of allegations regarding

26   the misrepresentations and omissions, which are applicable to *all* claims, and include:

27        (1) Capitol's alleged failure to disclose that the price offered was less than "fair
          value" (the allegations here include those previously relevant to the "true value,"
28        "Capitol fairness opinions," and "minority shareholder opinions" categories);

(2) Capitol's failure to disclose the First California Northern share exchange (this was previously a part of the category of allegations re: "true value");

(3) Capitol's allegedly understated profitability projections re: NCB stock (new);

(4) Capitol's alleged references to a "plan," suggesting a "moral or legal" obligation to sell (partially new);

(5) Capitol's suggestion the shareholders would receive a "premium" to fair value (appears to be new); and

(6) oral misrepresentations made primarily via telephone (new).

> **2.      Claims  One and Two:  False and Misleading Statements in Registration Statement under 1933 Securities Act § 11 and Sale of a Security by Means of a Prospectus or Oral Communication under 1933 Securities Act § 12(a)(2)**

Plaintiffs claim that the registration statement contained untrue statements of material facts and omitted to state material facts, and that Capitol secured the exchange offer by means of a prospectus and oral communications that contained untrue statements of material facts and omitted to state material facts.

Capitol makes three arguments in support of dismissal of claims 1 and 2 in the 1AC: (1) Rule 9(b) applies to the section 11 and section 12 claims because they sound in fraud; (2) the claims do not allege a material misrepresentation or omission; and (3) that claim one (the section 11 claim) should be dismissed because it does not allege section 11 damages.

> **a.      Whether Rule 9(b) applies to the Section 11 and 12 Claims because They Sound in Fraud**

Previously, in dismissing the section 11 claim, the court held that because plaintiff's complaint "sound[ed] in fraud," plaintiffs were indeed subject to Rule 9(b)'s heightened pleading standard with respect to their section 11 claim.  *See Dauo*, 411 F.3d at 1027.  The court found that like *Dauo,* the plaintiffs have alleged a fraudulent scheme; and, like *Daou,* plaintiffs' complaint "fully incorporates all allegations previously averred in the complaint for purposes of all their claims."  *Id.*  Additionally, like *Dauo*, plaintiffs' section 11 claim "makes a 'wholesale adoption' of the securities fraud allegations for purposes of the [1933]

1   Securities Act claims." *Id.*  Accordingly, the court held that plaintiffs' section 11 claim was

2   required to demonstrate *with particularity* in accordance with Rule 9(b) that: (1) the

3   registration statement contained an omission or misrepresentation; and (2) and that the

4   omission or misrepresentation was material – that is, that it would have misled a

5   reasonable investor about the nature of his or her investment.  *In re Stac,* 89 F.3d at 1403-

6   04.  It found that plaintiffs had not done so.

7        Capitol again argues that Rule 9(b) applies to the 1AC's section 11 and 12 claims

8   because they sound in fraud.  It notes that plaintiffs allege the same misrepresentations in

9   support of their 1933 and 1934 Act claims.  It asserts that although with the 1AC, plaintiffs

10  "apparently hope to finesse Rule 9(b) by making certain allegations regarding 'devices,

11  schemes, and artifices' in support of the 1934 Act claims only," that based on this court's

12  holding in *Metricom*, they should not be allowed to finagle out from under Rule 9(b).  *See*

13  *Metricom*, 2004 WL 966291 at *24 (N.D. Cal. 2004).  In any event, Capitol argues that

14  plaintiffs must satisfy Rule 9(b) because they have alleged fraudulent conduct in support of

15  their section 11 and 12 claims.  *In re Leadis Tech., Inc. Sec. Litig.*, 2006 WL 496039 at *3

16  (N.D. Cal. 2006).

17       In opposition, plaintiffs do not explicitly contest this court's prior ruling regarding the

18  applicability of Rule 9(b).  However, again they suggest that it is not applicable here

19  because section 11 and 12 are strict liability statutes, and they have sufficiently alleged

20  material misrepresentations and omissions under those sections.  Nevertheless, plaintiffs

21  suggest that even assuming Rule 9(b) is applicable to these claims, it does not "require

22  [them] to submit evidence, prove the merits of their case or describe every circumstance or

23  fact in exhausting detail, particularly facts that are under defendants' exclusive control."

24              **b.      Whether Claims One and Two Allege Material
                         Misrepresentations and/or Omissions with Particularity**

25

26       As noted above, in the current motion to dismiss the 1AC, the parties focus on

     essentially six categories of allegations of material misrepresentations and/or omissions,
27
     most of which are common to all of the claims in this case.  The court sets forth those
28
     allegations and the parties' arguments in some detail as follows.

                                             14

### i.    failure to disclose that the price offered was less than "fair value"

Many of the 1AC allegations in this category were also at issue in the prior motion. Plaintiffs allege several facts that they claim demonstrate that Capitol knew but did not disclose that the price offered was less than "fair value." *See* 1AC at pars 49-59.  In their original complaint and in the prior motion to dismiss, plaintiffs referred to what they now call "fair value" as "true value."

Plaintiffs appear to have simply meshed together many of the allegations from their original complaint into the 1AC at pars. 42-67.  The only "new" allegation in this category concerns a conversation that took place in a car on around May 20, 2004, between a Capitol executive officer, Ms. English, and an NCB shareholder, Albert Holdener, in which English allegedly told Holdener that NCB shares were worth approximately $32/share.

Because the allegations are nearly identical to the prior allegations, many of the parties' arguments are also simply a repeat of those from the prior motion.   Previously, the court found in its June 16, 2006 order with respect to the "true value" allegations, that plaintiffs failed to plead facts with particularity that defendants had a duty to disclose the information they claim should have been disclosed.  It noted that:  "Plaintiffs have not identified any SEC regulation or other legal authority that required defendant to disclose that information."

*General Arguments re: "Fair Value"*

In the current motion, Capitol argues that the "fair value," aka "true value" claim, fails as a matter of law for the same reasons that it did previously.  It notes again that securities laws are disclosure statutes, not "fair value" statutes.  *See Shearson v. McMahon*, 482 U.S. 220, 252 (1987).  Capitol argues that there is more than one "fair value" for any transaction, and that the exchange offer documents in this case did not represent that the price was the highest fair price.

1    In opposition, plaintiffs suggest that this is really a deception case, and not a "fair

2    value" case.  They assert that their claim "is based on being tricked into believing that they

3    were paid fair value when (1) the shares were objectively worth materially more than the

4    price offered, and (2) defendants knew they were offering a substantial discount to fair

5    value."  Plaintiffs nevertheless argue that misrepresenting "fair value" is indeed a violation

6    of federal securities laws.  In support, plaintiffs rely on the Ninth Circuit's decision in *Bell v.*

7    *Cameron Meadow Lands*, 669 F.2d 1278 (9th Cir. 1982).  In sum, plaintiffs contend that

8    they can prove that the fair value of the NCB shares was materially above the 150% book

9    value price offered by Capitol, and that Capitol knew that was the case.

10                                    *Capitol's Fairness Opinions*

11    Plaintiffs again allege that Capitol used biased and misleading fairness opinions

12    from JMP and Howe in connection with the Exchange Offer.

13    In its June 16, 2006 order, this court ruled that :

Regarding Capitol's own fairness opinions, although plaintiffs' complaint
sufficiently explains their basis for claiming that JMP's 2005 opinion was
biased and inaccurate, again, they still have not identified with particularity the
SEC regulation or other legal authority that required defendant to disclose
that information.  Additionally, they have *not* explained with particularity the
specific defects they claim are associated with the Howe opinion or the
pertinent legal authority pertaining to the alleged defects or requiring
disclosure.

Order at 20.

Plaintiffs' 1AC does not offer any greater detail than it did previously regarding the

JMP and Howe opinions, and Capitol reiterates many of its arguments regarding the

opinions.[4]

Plaintiffs counter that it is possible to determine the "fair value" of a transaction, and

_____

[4]Previously, Capitol argued that there were no facts pleaded with particularity to support
the allegations that the Exchange Offer did not adequately disclose JMP's bias and lack of
independence.  Capitol noted that the Exchange Offer specifically disclosed that it retained
JMP "as its financial advisor and agent" and paid JMP a $9k fee.  Citing RJN, Exh. 4 at 257,
290, 293.  It also argued that Howe's fairness opinion was "exemplary," and considered price
models of banks inside and outside California.  *Id.* at 318-19.  Additionally, Capitol noted that
its offer made adequate disclosures re: both the 2005 JMP and Howe fairness opinions in
connection with the NCB share exchange offer.  It further notes that the JMP fairness opinion
was dated May 27, 2005, and was not obsolete.  RJN, Exh. 4 at 312.

argue that Capitol's choice to pay for fairness opinions supports this proposition.  Plaintiffs argue that Ms. English's statements demonstrate that Capitol knew its fairness opinions materially understated the fair value of the NCB shares.  They also reiterate that, contrary to Capitol's suggestion, they have *not* dropped their claim that JMP was biased.  And, contrary to this court's June 16, 2006 order, plaintiffs argue that they do not need to "explain how or why the Howe Barnes opinion came to wrong conclusion."

In reply, Capitol notes that plaintiffs do not allege with any particularity that it misstated the facts upon which Capitol's fairness opinions were based.  Capitol also asserts that plaintiffs misrepresent both the content of Capitol's fairness opinions and the law applicable to fairness opinions.  Capitol reiterates that the fairness opinions did not assert what the NCB shares were "worth" much less their "best possible value."  It notes that the prospectus stated that Capitol had paid for the fairness opinions, that the opinions were directed to Capitol, and also that there were inherent conflicts of interest in having a parent make an offer to minority shareholders of a subsidiary.

The pertinent provision of the prospectus provides:

**Inherent Conflicts of Interest in the Exchange Offer**

> NCB is already a majority controlled subsidiary of Capitol.  By virtue of the existing relationship between NCB and Capitol, the proposed exchange offer presents inherent conflicts of interest. . . .   Accordingly, the NCB share value and related exchange ratio have not been determined absent the inherent conflicts of interest between Capitol and NCB.  *It is unknown what exchange ratio or NCB share value, if any, that might be negotiated between NCB and unaffiliated entities.*

RFJN at 267.

Capitol also notes that regarding the JMP fairness opinion, the prospectus provides in part that:

> NCB shareholders are urged to, and should, read the opinion carefully and in its entirety.  The opinion is directed to Capitol and addresses only the fairness from a financial point of view of the consideration received pursuant to the exchange offer as of the date of the opinion.  It does not address any other aspect of the exchange offer and does not constitute a recommendation to any holder of NCB common stock as to whether or not to exchange their shares pursuant to the exchange offer.

1    RFJN at 290.  The prospectus also contains very similar admonitions regarding the Howe

2    fairness opinion.  *See id.* at 293; 321.

3         Capitol further points to recent district court cases that have required that the claim

4    allege with particularity that the opinion was both objectively and subjectively false. *See*

5    *Shurkin v. Golden State Vintners, Inc.*, 2005 WL 1926620 at * 9 (N.D. Cal. 2005) (Jenkins,

6    J.); *Bond Opportunity Fund v. Unilab Corp.*, 2003 WL 21058251 at *5 (S.D.N.Y.  2003).

7                                    *MSC Fairness Opinion*

8         The MSC fairness opinion allegations are contained at 1AC pars 55-57.

9    Plaintiffs allege that the NCB board of directors received the MSC fairness opinions, which

10   provided that the fair market value for NCB shares was at least $21/share, at an April 11,

11   2006 meeting, during which the fairness opinions were discussed.  Plaintiffs allege "based

12   on information and belief" that copies of the fairness opinions were subsequently delivered

13   to Capitol.

14        Previously, plaintiffs alleged that the registration statement was misleading because

15   it failed to disclose the minority shareholder committee's fairness opinion, and this court

16   ruled that:

17        Regarding the MSC fairness opinions allegations, this court may take judicial
          notice of the fact that the opinions were within the public market at RJN, Exh.
18        11 at 372, 383.  The Ninth Circuit spoke to this very issue in *Heliotrope*, 189
          F.3d at 981 n.18, holding that in consideration of a motion for judgment on the
19        pleadings, it could "take judicial notice that the market was aware of the

20        information contained in news articles submitted by the defendants." *Id.*
          (citing Fed.R.Evid. 201; *Basic Inc.*, 485 U.S. at 244-47).  The *Heliotrope* court
21        granted judgment on the pleadings on plaintiffs' section 10(b) & 10b-5 claim
          where "the record show[ed] that the market was aware" of the very
22        information that plaintiffs asserted defendants in that case failed to disclose.
          189 F.3d at 180-81.
23
          Although *Heliotrope* involved a section 10(b) claim that required proof of
24        causation, unlike a section 11 claim, persuasive authority exists extending the
          Ninth Circuit's holding in *Heliotrope* to section 11 claims.  In *In re Merrill*
25   *Lynch*, the district court held that the defendants could "not be held liable [under section 11]
     for failing to disclose  that [it] provided investment banking services to companies in the
26   Fund's portfolio if the information was already public."  272 F.Supp.2d 243, 249-50
     (S.D.N.Y. 2003).  It noted that "[s]ection[] 11 do[es] not require the disclosure of publicly
27   available information."  *Id.* (citing three circuit cases in support including cases from the
     Third, Seventh, and Second Circuits).
28
          Alternatively, even if this court did not dismiss the portion of the claim based
          on the MSC fairness opinions because of their public nature, as with the

                                             18

1
2
3

> above allegations, plaintiffs are still required under Rule 9(b) to plead this
> claim with particularity, including providing dates and particulars regarding
> which defendants were aware of the MSC's fairness opinions and when they
> were received.  Plaintiffs should also identify the SEC regulation or other legal
> authority that required defendant to disclose that information.

4

 June 16, 2006 Order at 19-20.

5
6
7
8
9
10
11

In its motion, Capitol argues that the 1AC fails to allege with particularity a material misrepresentation or omission, and how or when defendants became aware of the MSC fairness opinions.  It further notes that contrary to this court's June 16, 2006 order, plaintiffs have not identified the legal authority that required disclosure of the MSC fairness opinions. Again, Capitol notes that, nevertheless, to the extent there is such a duty, it was satisfied since the fairness opinions were already public information.

12
13
14

In opposition, plaintiffs argue that Rule 9(b) does not require exact dates and methods by which Capitol became aware of the opinions.  Plaintiffs assert that it was enough to allege that defendants were aware of the opinions.

15
16

In reply, Capitol argues that the fact that the MSC's fairness opinions differed from Capitol's fairness opinions does not make Capitol's opinions objectively false.

17
18
19
20

At the October 11, 2006 hearing, plaintiffs conceded that they were no longer arguing that Capitol should have disclosed the MSC opinions.  Instead, plaintiffs asserted that their argument regarding the MSC opinions was that they were relevant to Capitol's alleged knowledge that its own JMP and Howe fairness opinions were misleading.

21

### ii. failure to disclose the First California Northern ("FCN") share exchange

22
23

These allegations also previously served as a basis for plaintiffs' claims in the original complaint.

24
25
26
27
28

As noted, in May 2004, Capitol offered to NCB Holdings' minority shareholders (not the exchange that is the subject of the instant lawsuit) to exchange shares of Capitol for those of NCB Holdings at a ratio that translated to 167% of the book value of the common stock of NCB Holdings.  *See* Suppl RJN, Exhs. 15 (also referred to by the parties in the current motion papers as "First California Northern" share exchange).  That exchange offer was also accompanied by a fairness opinion from JMP Financial.  *See id.* at Exh. 16.

19

1    Plaintiffs assert in the 1AC that Capitol's failure to disclose the NCB Holdings share

2   exchange rendered the prospectus and registration statement misleading because shares

3   in "First California Northern" aka "NCB Holdings" were equivalent to NCB shares, and a

4   reasonable investor would have considered it important to know that Capitol paid a higher

5   price for the First California Northern ("FCN") shares.  1AC, par. 48.

6    Because these allegations previously served as a basis for plaintiffs' claims in the

7   original complaint, the current arguments are again very similar.

8    Capitol refers to NCB Holdings as "FCN," and argues that the FCN shares were not

9   equivalent to NCB shares because FCN was a holding company, and NCB a subsidiary.

10   Capitol further notes that the two share exchanges were materially different.  With the

11   share exchange at issue in this case, individual NCB shareholders could decide whether or

12   not to tender their shares.  With the FCN share exchange, a simple majority vote forced the

13   exchange of all FCN shares.  Citing Suppl. RFJN, Exh. 16 at 603, 605.  Thus, Capitol

14   argues that it could logically pay more for the FCN shares – even if they were the

15   equivalent of NCB shares (which it argues they were not) – because Capitol would acquire

16   *all* the FCN shares in that exchange, unlike the NCB share exchange.

17    Additionally, Capitol notes that the FCN share exchange was public, and therefore a

18   part of the total mix of information available to NCB shareholders, and did not need to be

19   disclosed.  *See In re Merrill Lynch et al. Sec. Litig.*, 272 F.Supp.2d 243, 249-50.[5]

20    In opposition, plaintiffs essentially argue that the fact that the information was public

21   does not defeat its claim because there were hundreds of filings with the SEC, and the

22   shareholders could not have obtained the information.  It asserts without citation that

23   "[f]ederal securities laws do not impose such demanding standards of due diligence

24

25   _____

26        [5]Previously, Capitol asserted that it was under no obligation to disclose the 2004 JMP
     fairness opinion that had been prepared in connection with the 2004 NCB Holdings share
     exchange.  Moreover, it noted that the JMP fairness opinion had been made public in SEC

27   filings.  *See* RFJN, Exh. 15 at 537-38; Exh. 16 at 649-50.  It asserted that anyone who looked
     at the numbers, would have realized that the 2004 offer was for more than 150% of book

28   value, and that section 11 does not require the disclosure of information that is already in the
     public record.  Capitol also argued that the omission of the JMP fairness opinion was not
     material because it did not significantly alter the mix of material available.

1   investigation on ordinary shareholders, let alone in this case where the NCB investors

2   rightfully believed Capitol would volunteer this information."  Moreover, plaintiffs contend

3   that the critical information regarding the precise price for the shares – 167% of book value

4   – was not included in any of the publicly-filed documents.

5        In reply, Capitol notes that there is no single "fair value" and that both 150% and

6   167% of book value may constitute "fair value."  It further asserts that plaintiffs again fail to

7   identify any legal authority requiring disclosure of the earlier share exchange.  Moreover,

8   Capitol emphasizes the public nature of the prior share exchange, and argues that,

9   contrary to plaintiffs' position, the public disclosure in Capitol's SEC filings was sufficient as

10  a matter of law. *See In re Merrill Lynch*, 272 F.Supp. 2d at 250 (involving public information

11  contained in SEC filings); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 214 (5th Cir. 2004).

12                          **iii.    understated profitability projections**

13       This allegation is new to the 1AC.  The prospectus provided regarding Capitol's

14  "Reasons for the Exchange" that "Capitol believes that NCB's profitability will increase."

15  RFJN, Exh. 4, at 280.  Plaintiffs claim that the statement is misleading because it fails to

16  disclose the expected *significant* or *dramatic* increase in profitability.  1AC, par. 30.

17       Capitol argues that the statement regarding profitability projections is not actionable

18  because it was a mere statement of optimism or puffery.  Additionally, it argues that the

19  statement was not misleading given the other information provided in the registration

20  statement, including that NCB's net income for the 1Q of 2005 was four times that of the

21  same period in 2004.  Capitol also argues that there is no duty under Ninth Circuit law to

22  disclose income projections for NCB in a prospectus.  *See In re Lyondell Petrochemical Co.*

23  *Sec. Litig.*, 984 F.2d 1050, 1053 (9th Cir. 1993); *In re Convergent Technologies Sec. Litig.*,

24  948 F.2d 507, 516 (9th Cir. 1991).  Finally, Capitol argues that the statement was a

25  forward-looking statement regarding NCB's future prospects, which is also not actionable

26  unless it was made without a reasonable basis or lacked good faith. *See Wielgos v.*

27  *Commonwealth Edison Co.*, 892 F.2d 509, 513 (7th Cir. 1989).

28       In opposition, plaintiffs argue that even if Capitol was not required to disclose NCB's

    income projections, it did so voluntarily, and was therefore required that they not be

misleading.  Plaintiffs further assert that because Capitol was an insider with fiduciary

duties to NCB shareholders, it was obligated to ensure that the shareholders  had the same

information that Capitol had.  They contend that "Capitol knew that NCB was on track for

66% net income growth in 2005," but that the shareholders had no reason to be aware of

this information.  Plaintiffs also argue that Capitol's statement was neither puffery nor a

simple forward-looking statement.  *See Casella v. Webb*, 883 F.2d 805 (9th Cir. 1988).

In reply, Capitol notes that plaintiffs' arguments regarding its alleged fiduciary duties

and insider status are irrelevant because plaintiffs are not alleging claims for breach of

fiduciary duties.[6]  Capitol also correctly notes that plaintiffs cite no authority in support of

their contention that federal securities laws impose higher duties of disclosure on fiduciaries

in connection with tender offers.  Capitol argues this case is far from unique because the

directors and senior officers typically named in federal securities cases could frequently be

considered fiduciaries.  Finally, Capitol argues that, here, the profitability predictions were

not misleading, but were actually accurate.

### iv.    references to a "plan," suggesting a "moral or legal" obligation to sell

Plaintiffs previously alleged in the original complaint that Capitol failed to disclose

the absence of the existence of a formal agreement to buy NCB stock at 150% book value.

The 1AC describes alleged references to a "plan" suggesting a "moral or legal" obligation to

sell.  1AC at pars. 34-41.  These statements were allegedly contained in three written

sources: (1) a June 2, 2005 cover letter with the offer documents signed by defendant

Reid; (2) a "fact sheet prepared for minority shareholders" included with the offer

documents; and (3) a June 2005 article in the Napa Valley Register newspaper quoting the

chairperson of the NCB board of directors, Betty O'Shaughnessy.  Plaintiffs assert in the

1AC that "it was a material omission for Capitol not to clearly and prominently tell NCB

shareholders in the Registration Statement that they were under no obligation to participate

---

[6]Capitol is correct.  Plaintiffs previously alleged two state law claims based on breach of fiduciary duties.  However, plaintiffs agreed that those claims should be dismissed with prejudice because they were preempted by SLUSA.

in the 'plan' and that in fact there existed no moral or legal obligation of any kind to sell their shares to Capitol."  1AC, par. 40.

Citing *Metricom*, Capitol argues that none of alleged references were part of the registration statement, and thus are not actionable under section 11.  *See* 2004 WL 966291 at *9.  Moreover, Capitol contends that use of the word "plan" was not misleading given the repeated disclosures in the registration statement documents that the exchange offer was optional.  *See* Def. Oppos. at 10, n. 4.

In opposition, plaintiffs suggest that the references must be considered in context. They interpret the statements as suggesting that the chairperson of the NCB board believed that she was under an obligation to sell, and assert that other shareholders must have made the same assumption.  Plaintiffs do not address Capitol's argument regarding the fact that the sources were not part of the registration statement, but merely state that they are simply some "of the many pieces of evidence demonstrating that shareholders' misunderstanding was carefully cultivated by Capitol over a long period."  Plaintiffs argue that in light of the misunderstanding, a corrective disclosure in the registration statement was necessary and that none of the language that Capitol cites to in its motion was sufficient to correct the misunderstanding.

**v.    suggestion that shareholders would receive a "premium" to fair value**

Plaintiffs allege in their 1AC that the registration statement "included lengthy language and documents that stated or implied that the offering price reflected a premium to fair value and/or that the price offered was fair and based on objective analysis."  1AC, par. 60.  In support, plaintiffs note several references throughout the prospectus to a "premium."

Plaintiffs provide only part of the paragraph in which the term was used in the 1AC. The entire paragraph is as follows:

> At March 31, 2005 the book value per share of NCB was approximately
> $10.544974.  If the exchange ratio was based on March 31, 2005 NCB book
> value, the share value would be $15.817461 per share of NCB common
> stock.  The actual exchange ratio will be based on the actual book value per
> share of NCB as of May 31, 2005, applying the *same premium.*

1    RFJN at 000250; *see also* RFJN at 254 (same passage); RFJN at 281 (same passage).

2        Plaintiffs also cite to another paragraph in the prospectus in a section entitled

3    "Background of the Exchange," which provides in pertinent part that:

4        The objectives of the potential exchange would be to enable shareholders of
         NCB to achieve liquidity in their investment, a reasonable return on their
5        investment in the form of a "*premium,*" and to accomplish such an exchange
         on a tax-free basis.
6
     RFJN at 280.
7
         Plaintiffs assert that the registration statement omitted material language "that the
8
     offering price included no premium to the shares' *fair value*." 1AC at pars. 66-67.  They
9
     contend that it "was material to NCB shareholders to know whether the price they were
10
     being offered was believed to reflect a premium over fair value or a premium over book
11
     value."  Plaintiffs further assert that "[d]ue to the importance of this distinction, and the
12
     repeated use of the word 'premium' in the Registration Statement without adequate
13
     clarification of the distinction, the lack of adequate disclosure created a reasonable
14
     probability of misleading NCB shareholders as to the value of NCB shares and the
15

16   reasonableness of the Share Exchange Offer."  1AC at par. 67.
17
         Capitol argues simply that the four uses of the word "premium" were neither false
18
     nor misleading, and that the shareholders did in fact receive a premium of 50% over the
19
     book value of their shares.  In opposition, plaintiffs assert that defendants are arguing the
20
     merits of the case, and that it is for the jury to decide whether Capitol's use of the word
21
     "premium" was misleading.
22
                        **vi.    oral misrepresentations made primarily via telephone**
23
         Among the new allegations (with the exception of one)[7] in plaintiffs' 1AC are a
24
     number of alleged oral misrepresentations that plaintiffs refer to as a telephone "campaign
25

26   _____

27       [7]In their original complaint, as in their 1AC, in conjunction with their 10b claim, plaintiffs
     argued that "Capitol made the misleading statement that all of the NCB board members had
28   rendered their shares."  According to plaintiffs, the statement was misleading because it
     created a false impression that the NCB board members thought favorably of the Exchange
     Offer.  They argued that it was false because at least one NCB board member had withdrawn
     his or her tender of shares.

                                         24

1    of deception." 1AC at pars. 68-90.  Plaintiffs contend that defendant Reid directed NCB

2    board members to engage in this telephone campaign in response to minority

3    shareholders' criticism of the exchange.  In terms of the alleged misrepresentations,

4    plaintiffs first point to telephone calls received by two NCB shareholders (not the named

5    plaintiffs), Jan Smith and Doris Baker, from NCB board president, Dennis Pedisich, in

6    which Pedisich allegedly told the shareholders that their *NCB shares would be worthless if*

7    *they did not sell to Capitol.  Id.* at pars. 69-76.  Second, plaintiffs allege that Baker was also

8    told in the same phone conversation that she "*had no choice but to tender her NCB shares*

9    *to Capitol.*"  *Id.* at par. 77.  Third, plaintiffs assert that another NCB shareholder, Patricia

10   Drucquer, also received a call from Pedisich during which he told her that the *NCB shares*

11   *would be illiquid if not sold.*  Fourth, plaintiffs contend that NCB shareholder Dianne Burke

12   received a call during which Pedisich told her that *98% of NCB shareholders were*

13   *tendering their shares to Capitol.*  Finally, plaintiffs allege that a fifth NCB shareholder,

14   Franz Wartenweiler, also received a call from Pedisich and was told that *all NCB board*

15   *members had tendered their shares.*

16          In its motion, Capitol raises five arguments with respect to these allegations.  First, it

17   notes that named plaintiffs have not alleged that they personally received any of the alleged

18   oral misrepresentations.  Second, it notes that the prospectus specifically told NCB

19   shareholders *not* to rely on oral statements.  *See* RFJN at 304.[8]  Third, Capitol argues that

20   there can be no liability under section 11 for the statements because they were allegedly

21   made between June 15-24, 2005, *after* the registration statement became effective on June

22   2, 2005.  Fourth, Capitol contends that because the alleged misrepresentations were made

23   by non-party Pedisich, that Capitol cannot be held liable under section 12.  It notes that

24   _____

25          [8]The prospectus stated that:

26          No one has been authorized to give any information or make any representation
           about NCB, Capitol or the exchange offer that differs from, or adds to, the
27         information in this document or in documents that are publicly filed with the SEC.
           *Therefore, if anyone does give you different or additional information, you should*
28         *not rely on it.*

RFJN at 304.

1   plaintiffs have not alleged with any specificity that defendant Reid instructed Pedisich to

2   make the specific allegations.  It argues that "in any event, such allegations would only be

3   relevant to a claim for control person liability under section 20; they would not establish that

4   Capitol or Reid was primarily liable under section 12 for the alleged statements of NCB's

5   president."  Finally, Capitol argues that the alleged misrepresentations cannot state a claim

6   under Rule 9(b).

7           In opposition, plaintiffs assert that they were not required to give details regarding

8   specific phone calls to the class representatives.  However, without explicitly stating that

9   such calls existed, they suggest that is the case and note that "if necessary, plaintiffs can

10  amend the 1AC to include specific allegations with respect to telephone calls received by

11  the class representatives with respect to the telephone campaign of deception."  Plaintiffs

12  further argue that Capitol's "boilerplate" language in its registration statement disclaiming

13  outside information is not dispositive.

14          Plaintiffs also counter that Capitol may be liable for Pedisich's representations under

15  section 12 if Reid and Capitol were substantial factors in the sales.  *See Moore v. Kayport*

16  *Package Exp., Inc.*, 885 F.2d 531, 536 (9th Cir. 1989).  Plaintiffs assert that Reid had the

17  authority to direct Pedisich to carry out the calls, and exercised control over Pedisich.

18          As for Capitol's Rule 9(b) argument, plaintiffs argue that Capitol is not immune from

19  deliberate lies.  It cites no authority in support.  They also argue that Capitol is attempting

20  to argue the merits of the claims prematurely.

21          In reply, Capitol further notes that plaintiffs have not alleged that defendants directed

22  Pedisich to make the alleged particular misrepresentations, but only that Reid "exhorted"

23  board members to generally "call or otherwise communicate with the NCB shareholders on

24  behalf of Capitol."  1AC at par. 68.  In other words, according Capitol, it did not "exhort" the

25  board members to lie on Capitol's behalf.

26                      **c.      Whether the claim should  allege section 11 damages**

27          Capitol again argues as it did in its original motion to dismiss that the 1AC does not

28  contain allegations that plaintiffs have suffered section 11 damages.  It asserts that

    plaintiffs cannot raise a section 11 claim "unless Capitol stock now trades for less than the

price plaintiffs paid for it."  *See* 15 U.S.C. § 77(k)(e); *Metz v. United Counties Bancorp*, 61

F.Supp. 2d 364, 378 (D.N.J. 1999).  It argues that plaintiffs can state a section 11 claim

only if Capitol stock was trading on the date this case was filed for less than the price

plaintiffs paid for it, which it was not.[9]

In opposition, plaintiffs assert that no allegation of damages is necessary for a

section 11 claim.  They further argue that Capitol improperly refers to evidence not before

this court regarding stock price, and that the case cannot be dismissed at this time based

on that evidence.  They also contend that NCB shares were not traded on an exchange,

and that "market value" has not yet been established.  They assert that all inferences

should be drawn in their favor at this stage of the litigation.

Plaintiffs explain that nevertheless they "have clearly alleged that they incurred

substantial damages of up to $6 million in the aggregate due to their being tricked into

selling their shares for a substantial discount to fair value."  They further assert that the

case does not concern the intrinsic value of Capitol shares, and that a rising share price

only exacerbates their damages.

In reply, Capitol argues that the existence of damages must be affirmatively pleaded

under section 11, and that to the extent plaintiffs' cases state otherwise, they are dated.  It

further contends that the evidence it has submitted regarding NCB stock price is evidence

this court may take judicial notice of in the context of this motion. *See Metz*, 61 F.Supp.2d

at 378; *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 147-49 (2d Cir.

1995).

### d.    Analysis

This court's prior conclusion that plaintiffs' original complaint "sound[ed] in fraud"

applies equally to plaintiffs' 1AC.   Again, factually, plaintiffs' 1AC is  very similar to the

complaint at issue before the Ninth Circuit in *Dauo*. 411 F.3d at 1027.  Like *Dauo,* the

plaintiffs have alleged a fraudulent scheme; and, like *Daou,* plaintiffs' complaint "fully

---

[9] Previously, Capitol noted that plaintiffs' stock has progressively increased in value from the time they got the stock until the time they sued and from the time they sued until today.  Citing RJN, Exh. 13 at 473-477.

1    incorporates all allegations previously averred in the complaint for purposes of all their

2    claims."  *Id.*  Additionally, like *Dauo*, plaintiffs' section 11 and 12 claims "make[] a

3    'wholesale adoption' of the securities fraud allegations for purposes of the [1933] Securities

4    Act claims."  *Id.*

5            Therefore, with respect to their section 11 and 12 claims, plaintiffs must demonstrate

6    *with particularity* in accordance with Rule 9(b) that: (1) the registration statement contained

7    an omission or misrepresentation; and (2) and that the omission or misrepresentation was

8    material – that is, that it would have misled a reasonable investor about the nature of his or

9    her investment.  *In re Stac,* 89 F.3d at 1403-04.

10           Again, plaintiffs' 1AC fails to allege specific facts regarding the falsity of the

11   misrepresentations and omissions in connection with the registration statement for the

12   reasons set forth below.  *See In re Stac*, 89 F.3d at 1405

13           In terms of the **fair value allegations**, plaintiffs offer only the *Bell* case in support of

14   their argument that defendants had a duty to disclose the fair value of the NCB shares.

15

16   669 F.2d at 1278.  *Bell*, however, which involved section 10(b) and 14(e) claims, is

17   distinguishable.  In *Bell*, Cameron Meadows Land Company, possessed a large tract of oil

18   and gas producing property, for which there were 134 shareholders.  *Id.*  The shares were

19   not public,  and had sold infrequently in the ten years prior to the tender offer at issue in

20   *Bell* for between $30 and $55.  *Id.* at 1280.  Defendant Santa Fe made a tender offer to

21   Cameron Meadows shareholders for all outstanding shares at $186/share.  *Id.*  The offer

22   referred to a land appraisal, which suggested a "fair market value" for the shares at a price

23   substantially below the tender offer price.  *Id.*  On summary judgment, the court held that

24   plaintiffs' federal securities claims presented "numerous genuine issues of material fact. . .

25   to be resolved at trial," including "whether the tender offer price was below fair market

26   value."  *Id.* at 1284.

27           This case is distinguishable from *Bell* because plaintiffs have not alleged that

28   Capitol's fairness opinions from JMP and Howe offered the type of explicit opinion

     regarding "fair market value" provided by the defendant's appraisal in *Bell.*  Thus, contrary

1   to plaintiffs' arguments, *Bell* does not stand so much for the proposition that a defendant

2   has a *duty* to disclose "fair market value" in connection with a tender offer, as it does for the

3   fact that where an offeror explicitly discloses "fair market value," as in *Bell*, that it must not

4   be misleading.

5          Additionally, plaintiffs are unable to show that JMP's and Howe's fairness opinions

6   were both subjectively and objectively false.   "A fairness opinion is objectively false if the

7   subject matter of the opinion is not, in fact, fair, and is subjectively false if the speaker does

8   not, in fact believe the subject matter."  *Shurkin*, 2005 WL 1926620 at *9 (citing *McKesson*,

9   126 F.Supp.2d at 1265).  In an attempt to demonstrate the subjective falsity, plaintiffs have

10  alleged a conversation between Capitol executive, English, and another NCB shareholder.

11  1AC at par.  50.  However, there is nothing to suggest that English's opinion regarding the

12  valuation of the NCB shares represented Capitol's opinion.

13         Moreover, the fact that the MSC fairness opinions differed from Capitol's fairness

14  opinions does not demonstrate that Capitol's fairness opinions were objectively false.

15  There can be more than one appropriate price.  At the hearing, plaintiffs conceded that

16  contrary to their arguments otherwise, Capitol's fairness opinions did not specifically opine

17  regarding "fair market value."  Accordingly, plaintiffs have failed to allege with sufficient

18  particularity facts demonstrating the objective falsity of the fairness opinions.

19         Furthermore, this court's prior ruling that it may take judicial notice of the fact that

20  information was public, and defendants therefore were not liable for failing to disclose it,

21  applies to plaintiffs' allegations regarding the **First California Northern share exchange.**

22  *See Heliotrope*, 189 F.3d at 981 n.18; *Merrill Lynch*, 272 F.Supp.2d at 249-50.

23         As for the **understated profitability projections**, the court does not need to

24  determine whether or not the statements were mere puffery because plaintiffs have entirely

25  failed to demonstrate with particularity their falsity.  Plaintiffs have not sufficiently alleged

26   that Capitol's statement that it believed NCB's profitability would increase was either

27  subjectively or objectively false.  Plaintiffs have not alleged any authority that required

28  Capitol to insert the adverb "dramatically" following its prediction of an "increase" in NCB's

    profitability.  Moreover, plaintiffs' arguments regarding Capitol's alleged fiduciary duties are

                                              29

1   unsupported by legal authority, and are not pertinent to plaintiffs' surviving claims in this

2   case.

3        Regarding the **references to a "legal or moral obligation to sell,"** Capitol is

4   incorrect that none of the references were included in the offer documents themselves and

5   therefore are not actionable.  At least two of the references included in plaintiffs' 1AC are to

6   the offer documents.  Nevertheless, as with the preceding allegations, plaintiffs have not

7   shown that the statements were false; nor have they alleged any authority that required

8   Capitol to admonish NCB shareholders that they were under no "legal or moral" duty to sell.

9

10       Turning to the allegations that plaintiffs were misled into believing that they would

11  receive a **"premium"** over the "fair value" of NCB shares, plaintiffs have completely

12  misconstrued the relevant offer language.   The registration statement is not misleading.  It

13  is clear from the context and the language in the registration statement that the premium

14

15  was over *book* value – not *fair* value.

16       Plaintiffs' allegations regarding the **telephone campaign of deception** also fail.

17  They fail because they were made *after* the registration statement became effective on

18  June 2, 2005.  *See, e.g., Shurkin*, 2005 WL 1926620 at *9.  They also fail because plaintiffs

19  have not alleged with particularity that the alleged misrepresentations or lies were at

20  Capitol's direction.  Plaintiffs' allegation that Reid "exhorted" Pedisich to call NCB

21  shareholders does not mean that Pedisich actually made the calls, or that Pedisich, in the

22  calls he made, relayed misleading or deceptive information.  Additionally, the fact that

23  plaintiffs' related allegations are "based on information and belief" hardly explains with

24  particularity how defendants caused the misleading statements to be made, nor does it

25  sufficiently tie defendants to the allegedly misleading statements.

26       Moreover, Capitol is correct that plaintiffs have not alleged sufficient facts to hold

27  defendants liable for non-party statements under section 12.  The Supreme Court has

28  established that under section 12, a person is a statutory seller, or sells securities, if he or

    she either passes title of the security to the purchaser, or solicits the sale of the security.

1   *Pinter v. Dahl*, 486 U.S. 622, 646-648 (1988); *Moore*, 885 F.2d at 536 (*Pinter's* reasoning

2   applies equally to sections 12(1) and 12(2)).

3        Neither party has clearly articulated the issue here.  The issue here is not whether

4   defendants were "sellers" under section 12.  Capitol likely constitutes a "seller" under the

5   *Pinter* case's definition.  The problem is that the oral solicitations were made by a non-

6   party.  It is possible that Pedisich could also be considered a "seller" under the section.

7   *See Pinter*, 486 U.S. at 647 (seller also includes those who solicit sale of security and are

8   motivated by financial gain).  However, plaintiffs have not named Pedisich as a defendant.

9   Thus, the question is really whether Capitol can be held liable as a matter of law under

10  Rule 12(b)(6) for Pedisich's representations.  Here, plaintiffs simply have not alleged

11  sufficient facts with particularity that would enable the court to tie Pedisich's representations

12  to Capitol under section 12.

13        For these reasons, the court GRANTS Capitol's motion to dismiss plaintiffs' section

14  11 and 12 claims.  Accordingly, it is not necessary for the court to reach the issue regarding

15  section 11 damages.

16        **II.    Claims Four and Six: False and Misleading Statements in Violation of §**
            **10(b) and Rule 10b-5 and § 14(e) of the Exchange Act**
17

18        The parties agree that the same six groups of factual allegations regarding the

19  alleged misrepresentations and omissions underlying claims one and two are also the

20  bases for the misrepresentations and omissions underlying plaintiffs' claims four and six.

21  Because this court's above conclusion that the six categories of allegations do not

22  sufficiently allege a material misrepresentation or omission with particularity applies as well

23  to the section 10(b) and 14(e) claims, the court will limit its discussion here to the issue of

24  scienter, as required for claims four and six.

25        With respect to their original complaint, plaintiffs previously argued that the

26  allegations "show[ed] a pattern from which it can logically be inferred that defendants were

27  attempting to manipulate the minority NCB shareholders into accepting the Exchange Offer

28  and tender[ing] their NCB shares to Capitol at below fair market price and without being

    able to have a shareholders' vote on the terms of the tender offer."  Previously, in its June

1    16, 2006 order, this court held that the 1934 Act claims suffered from the same lack of

2    particularity as the section 11 claim because plaintiffs had not explained the who, what,

3    where, or when with respect to either falsity or scienter.

4          Plaintiffs' latest scienter allegations are to a large degree, repetitive of allegations

5    that appeared in the general factual background of the original complaint.  In their 1AC,

6    plaintiffs allege that:

7          (1)   Defendants wanted to acquire NCB shares for a price of 150% of the book
                 value of those shares, and were motivated to do so for financial and strategic
8                reasons that included taking control of NCB to maintain Capitol's business
                 plan and to freeze out dissident shareholders.  (1AC, par. 114);
9
10         (2)   Defendants knew that a price of 150% of book value was a substantial
                 discount to the fair market value of the NCB shares, and defendants were
                 motivated to and did receive a financial benefit of up to a $6 million discount.
11               (1AC, par. 115);

12
13         (3)   Defendants were motivated to cause Capitol to acquire at least 80% of NCB
                 shares because had they not succeeded in owning 80% or more of NCB
14               stock, the exchange offer would have been a taxable transaction, which
                 would have made the offer much less attractive to NCB shareholders (1AC,
15               par. 116).  Moreover, if Capitol was unable to acquire 80% of NCB shares, it
                 could negatively affect future buyout offers. (1AC, par. 118);

16         (4)   Defendants were motivated to cause Capitol to acquire at least 90% of NCB
                 shares because they would then be able to effect a "squeeze out" merger that
17               would have forced the remaining NCB minority shareholders to sell their
                 shares.  (1AC, par. 117);
18
19         (5)   Capitol control person, Reid, intentionally or with deliberate recklessness,
                 exhorted members of the NCB board of directors and officers of NCB,
20               including specifically Dennis Pedisich, to make telephone calls to NCB
                 shareholders in connection with the share offer.  (1AC, par. 119).  Based on
                 information and belief, defendants caused those statements to be made to
21               the NCB shareholders either knowing that those statements were materially
                 misleading or with deliberate recklessness as to whether those statements
22               would be materially misleading.  (1AC, par. 119); and

23         (6)   Based on information and belief, defendants knowingly or with deliberate
                 recklessness caused the materially misleading statements and omissions
24               [above] to be included in the Registration Statement and the oral
                 misrepresentations alleged to be made.  (1AC, par. 119).
25
           Capitol argues that plaintiffs have again failed to allege "in great detail, facts that
26
     constitute strong circumstantial evidence of deliberately reckless or conscious misconduct,"
27
     Silicon Graphics, 183 F.3d at 974, or that "connect Capitol and Reid with specific
28
     intentionally reckless acts."  Id. at 1167.  Instead, Capitol contends that plaintiffs have

1   shown mere motive and opportunity, which are insufficient under Ninth Circuit law.  *See*

2   *Dauo*, 411 F.3d at 1022.

3   　　　In opposition, plaintiffs agree that they are required to plead facts raising a "strong

4   inference" of deliberate or knowing conduct.  *See In re Silicon Graphics*, 183 F.3d at 974.

5   They assert that they have done so.  They further note that the court should look at the

6   complaint as a whole in determining whether scienter exists.  Plaintiffs point to the following

7   seven categories of allegations of deliberate or reckless misconduct in support of their

8   argument that they have sufficiently pled scienter:

9   　　　(1)　　*Reid's personally directing Pedisich and NCB directors to engage in*
   　　　　　　*"campaign of deceptive phone calls"* (1AC at pars. 1, 68-90, 119)*;*

10

11  　　　As discussed above with respect to claims one and two, in reply, Capitol argues that

    the 1AC does not allege that Reid exhorted the NCB board members to lie on Capitol's
12
    behalf.  Instead, it contends the 1AC merely alleges that Capitol/Reid exhorted board
13
    members to simply "call or otherwise communicate" with the shareholders regarding the
14
    share exchange.
15
    　　　(2)　　*Capitol executives cashed in NCB Holdings or First California Northern*
16  　　　　　　*shares, which plaintiffs claim were NCB-equivalent, but did not tell*
    　　　　　　*NCB shareholders* (1AC at pars 42-48)*;*
17
18  　　　In reply, Capitol again notes the public nature of the SEC filings concerning this

    share exchange.  It further asserts that the 1AC does not allege **how** the participation of
19
    certain NCB executives in the prior share exchange demonstrates that Capitol/Reid acted
20
    with deliberate recklessness.
21
    　　　(3)　　*Reid personally and falsely accused the minority shareholders of*
22  　　　　　　*seeking revenge and seeking to gain control of NCB* (1AC at par 92)*;*

23  　　　In reply, Capitol points out that plaintiffs have misconstrued and misstated the

24  related allegations in the 1AC.

25  　　　(4)　　*Reid (and therefore Capitol) caused NCB to violate Rule 14e-2 and*
    　　　　　　*"starve the NCB shareholders of critically important information"* (1AC
26  　　　　　　pars. 29 & 144)*;*

27

28

1    In reply, Capitol asserts that plaintiffs have alleged no facts whatsoever - let alone

2    with particularity – on this point. [10]

3         (5)    *Defendants' knowledge of the minority shareholders committee*
                 *fairness opinions delivered to the NCB board of directors* (1AC par.

4                57);

5         In reply, Capitol notes that the 1AC does not allege actual knowledge, but instead

6    that Capitol "knew or should have known" of the MSC fairness opinions.

7         (6)    *Defendants' delivery of the allegedly biased JMP fairness opinion to*
                 *shareholders* (1AC pars. 51-54); and

8         In reply, Capitol again notes the detailed disclosures regarding its fairness opinions.

9         (7)    *The explanation of defendants' motive and opportunity* (1AC pars 114-

10               118).

11        In reply, Capitol argues that the "boilerplate" allegations are not alleged with

12   sufficient particularity.

13

14                **a.    14e-2 violation**

15         In their 1AC, plaintiffs have also added an allegation that NCB failed to comply with

16   Rule 14e-2 under the Exchange Act which required NCB to publish, send or give to NCB

17   shareholders a statement disclosing that NCB either "(1) recommended acceptance or

18   rejection of the Share Exchange Offer tender offer, (2) expressed no opinion and remained

19   neutral toward Capitol's Share Exchange Offer tender offer or (3) was unable to take a

20   position with respect to Capitol's Share Exchange tender offer."  1AC par. 29.  Plaintiffs

21   assert that Capitol thus caused NCB to violate Rule 14e-2 and that the registration

22   statement was therefore materially misleading.  *Id.*

23        Plaintiffs acknowledge in their opposition that the 1AC "alleges a naked violation of

24   the law, i.e., that the statement should have been prepared and it was not."  They clarify

25   that Capitol's violation of 14e-2 is "one more fact supporting an inference of scienter in

26   plaintiffs' overarching 10(b) and 14(e) allegations" (as opposed to a stand-alone claim).

27

28

_____

[10]A more detailed discussion of the alleged Rule 14e-2 violation follows.

1    In its motion, Capitol argues plaintiffs have not alleged a violation of 14e-2 on the

2    part of Capitol or Reid.  It argues that the only allegation tying defendants to the violation is

3    plaintiffs' allegation that defendants caused NCB to violate the rule.  Capitol contends that

4    plaintiffs have failed to allege sufficient facts showing that Capitol or Reid knew of NCB's

5    alleged rule violation, let alone sufficient facts that Capitol or Reid acted with the necessary

6    scienter.  Therefore, Capitol asserts that plaintiffs have not satisfied their pleading

7    requirements under the PSLRA.

8    In opposition, plaintiffs assert that scienter and materiality are not elements of a Rule

9    14e-2 violation, and therefore, it is not an allegation of fraud subject to Rule 9(b)'s

10   requirements.  Nevertheless, plaintiffs note that, if necessary, they will amend the 1AC "to

11   allege the details of the 4:00 p.m. January 20, 2005 NCB board executive committee

12   meeting that occurred in the NCB board room in which (1) Reid was present in person; and

13   (2) the fateful decision was made to refuse the minority shareholders' demand for a

14   statement of position" which violated Rule 14e-2.  Plaintiffs contend that there are "ample

15   allegations that Defendants were a necessary part of NCB's decision to violate Rule 14e-

16

17   2."

18   In reply, Capitol argues that because the alleged Rule 14e-2 violation is brought in

19   the context of the scienter alleged with respect to plaintiffs' section 14(e) and 10b claims, it

20   must be alleged with particularity.  Again, it contends that plaintiffs confuse primary liability

21   with control person liability, noting that the alleged 14e-2 violation was NCB's – not

22   Capitol's – and that plaintiffs have not sued NCB, and Capitol is not primarily liable for

23   NCB's alleged securities law violations.

24              **b.    Analysis**

25   As this court found in its June 16, 2006 order, the analysis is the same for both the

26   section 10 and section 14 claims because the falsity and scienter requirements are

27   identical.  As noted in the prior order, even though the Ninth Circuit has not decided the

28   issue regarding the scienter required under section 14(e), the majority of other circuits and

districts to address the issue have held that the scienter required under section14(e) is the

1   same as that required by section 10(b).  *See In re Digital Island Sec. Litig.,* 357 F.3d 322,

2   328-31 (3rd Cir. 2004). *Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 431 (6th Cir.

3   1980); *Sogevalor v. Penn Central Corp.*, 771 F.Supp. 890, 895 (S.D. Ohio 1991).  Because

4   the court found the reasoning of those courts to be persuasive, it concluded in the June 16,

5    2006 order that the Rubke plaintiffs are required to allege and prove the same scienter

6   under section 14(e) as section 10(b) and Rule 10b-5.  The court sees no reason to revisit

7   the issue.  Additionally, because the same alleged misrepresentations and omissions as

8   set forth above provide a basis for the 1933 and 1934 Act claims in the 1AC, claims four

9   and six fail for the reasons set forth above.

10       The court concludes that claims four and six also fail because plaintiffs have not

11   pleaded falsity and scienter with particularity.  "In considering whether a private securities

12   fraud complaint can survive dismissal under Rule 12(b)(6), [the court] must determine

13   whether particular facts in the complaint, taken as a whole, raise a strong inference that

14   defendants intentionally or with deliberate recklessness made false or misleading

15   statements." *America West*, 320 F.3d at 932 (citing *Ronconi*, 253 F.3d at 429, "noting that

16   pleading requirements under PSLRA can be collapsed into a single inquiry because

17   analysis of both requirements involve the same set of facts").  The court generally

18   considers falsity and scienter at the same time.  *Id.*

19       Plaintiffs' argument regarding scienter is unpersuasive.   First, plaintiffs have not

20   alleged with particularity facts beyond "information and belief" that tie Reid to the alleged

21   oral misrepresentations.  Second, plaintiffs have failed to allege facts with particularity that

22   demonstrate that the NCB Holdings shares were equivalent to NCB shares.  Third, the

23   MSC fairness opinions were public information.  Fourth, plaintiffs have not alleged with

24   particularity the subjective and objective falsity of the Capitol's fairness opinions.  The more

25   general allegations regarding defendants' motive and opportunity in the 1AC also fail for the

26   same reasons that they did with respect to the original complaint.  *See* 1AC pars 114-118.

27   Plaintiffs have not explained the who, what, where, when with respect to these scienter

28   allegations.  *See In re Silicon Storage Technology*, 2006 WL 648683 at *3.

1   Additionally, because the 14e-2 violation is brought as a *part* of the 10b and 14(e)

2   claims – and not as a stand-alone claim, plaintiffs must also allege the facts related to the

3   14e-2 violation with particularity, which they have not done.

4   For these reasons, the court GRANTS Capitol's motion to dismiss claims four and

5   six of the 1AC.

6   **III.   Claims Three and Five: "Control Person" Claims Under § 15 of the
        Securities Act and § 20(a) of the Exchange Act**

7

8   Adequate pleading of a primary violation is required for a plaintiff to adequately

9   plead control person liability.  *See* 15 U.S.C. § 78t.  Because the complaint fails to state a

10  claim for primary liability under, the court finds that the claims for control person liability

11  must be dismissed.

12  **IV.   Whether Leave to Amend Should be Granted**

13  Under Federal Rule of Civil Procedure 15, leave to amend shall be freely given when

14  justice so requires.  In the Ninth Circuit, this policy is "to be applied with extreme

15  liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir.2003).

16  However, "[a]lthough there is a general rule that parties are allowed to amend their

17  pleadings, it does not extend to cases in which any amendment would be an exercise in

18  futility, . . .  or where the amended complaint would also be subject to dismissal." *D.*

19  *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295 (9th Cir.1998) (citations omitted).

20  Plaintiffs' only argument regarding the propriety of leave to amend was contained in

21  a footnote to their opposition.  They cite *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir.

22  1996), for the proposition that "[d]ismissal without leave to amend is appropriate only if any

23  perceived deficiencies of the complaint could not possibly be cured by amendment."

24  In reply, Capitol noted that this court's June 16, 2006 order explicitly stated that

25  plaintiffs may file *one* amended complaint.  Capitol argued that the *Chang* case cited by

26  plaintiff actually supports dismissal without leave to amend in this case because the Ninth

27  Circuit in *Chang* affirmed the district court's dismissal of the 1AC without leave to amend

28  where it had previously provided the plaintiffs with a "detailed and accurate listing of what
    had to be included in any revised complaint."  *Id.* at 1301.  Moreover, Capitol contends that

1    plaintiffs' proposed amendments, appearing intermittently throughout their opposition,

2    would not cure the 1AC's legal deficiencies.

3          In this case, plaintiffs have twice failed to allege facts supporting their federal

4    securities claims (with the exception of the section 12 claim, new to the 1AC).  In granting

5    the first motion to dismiss, it is true that the court informed plaintiffs that their complaint was

6    deficient because it failed to plead particularized details supporting the falsity of the

7    misrepresentations and omissions and supporting scienter.

8          It now appears that further amendment of the section 11, 10b, Rule 10b-5, or 14(e)

9    claims with respect to the fair value allegations (which includes the allegations regarding

10   Capitol's fairness opinions and the nondisclosure of the MSC fairness opinons), the First

11   California Northern or NCB Holdings share exchange, the understated profitability

12   projections; the references to a "moral or legal" plan or obligation; and the "premium"

13   allegations, would be futile.  There is nothing further that plaintiffs could

14    add to a subsequent complaint to save the claims that are based on these allegations.

15         The only theory for which amendment may not be futile concerns plaintiffs'

16   allegations regarding the alleged oral misrepresentations, also referred to as the telephone

17   "campaign of deception."  If plaintiffs were able to amend the complaint to tie the alleged

18   misrepresentations to Capitol, they might be able to state a claim for which relief could be

19   granted.

20         Accordingly, the court will grant plaintiffs leave to amend their complaint *only* with

21   respect to the oral misrepresentations raised for the first time in their 1AC.  Because these

22   alleged misrepresentations were not included in the registration statement or related

23   documents themselves, plaintiffs will be precluded from raising section 11 or section 14(e)

24   claims in any subsequent amended complaint, since such claims must be based on

25   misrepresentations contained in the tender offer documents themselves – not oral

26   misrepresentations.

27         Therefore, Capitol's motion to dismiss the section 11 and section 14(e) claims is

28   GRANTED, and these claims are dismissed with prejudice.  Capitol's motion to dismiss the

section 12, section 10(b) and Rule 10b-5, and control person liability claims is GRANTED

1  with leave to amend only these claims and only with respect to plaintiffs' allegations related

2  to their theory of the telephone "campaign of deception."

3  **CONCLUSION**

4      Plaintiffs' claims one (section 11) and two (section 12) are dismissed based on

5  plaintiffs' failure to plead the material misrepresentations and omissions with particularity

6  pursuant to Rule 9(b).  Claims four and six (section10(b) and section 14(e)) are dismissed

7  for failure to plead the material misrepresentations and omissions with particularity and for

8  failure to plead falsity and scienter with particularity pursuant to the PSLRA and Rule 9(b).

9  Claims three and five, the control person liability claims under section 15 and section 20(a),

10  are dismissed because the 1AC fails to state a claim for primary liability.

11      The motion to dismiss is GRANTED with prejudice as to claims one and six (section

12  11 and section 14(e)), and without prejudice as to claims two (section 12), four (section

13  10(b)) and three and five (control person liability).  Plaintiffs may file one amended

14  complaint in accordance with the parameters set forth above, no later than 30 days after

15  the filing of this order.  Defendants may file their response to the amended complaint 30

16  days thereafter.

17

18  Dated: October 27, 2006

19  **IT IS SO ORDERED.**

20

21  _____

22  PHYLLIS J. HAMILTON
   United States District Judge

23

24

25

26

27

28